UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
LYNK MEDIA LLC,

                        Plaintiff,                              24-cv-29 (PKC)

         -against-                              <u>OPINION AND ORDER</u>

MEDIAITE, LLC,

                        Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.,

        Plaintiff Lynk Media LLC ("Lynk Media") brings claims of direct copyright infringement and contributory infringement against Defendant Mediaite, LLC ("Mediaite"). Lynk Media owns the copyrights to three videos, two of which show disruptions at events featuring United States Representative Alexandria Ocasio-Cortez ("AOC") and the other of which captures a physical altercation at a protest outside Gracie Mansion in New York City. Mediaite included each of these videos in articles published on its website without Lynk Media's authorization. The video of the altercation outside Gracie Mansion was also published on a third-party website, allegedly after Mediaite provided the video for that use.

        Mediaite has moved to dismiss Lynk Media's Amended Complaint on several grounds: non-infringement as to two of the videos based on its use of a technological process called "embedding" to include those videos in its articles, its use of two of the videos pursuant to a license from Twitter, fair use with respect to all three videos, and failure to state a claim for contributory infringement as to the video published on the third-party website. For reasons that will be explained, Mediaite's motion will be denied in its entirety.

BACKGROUND

For the purposes of Mediaite's motion to dismiss, the Court accepts well-pleaded allegations in Lynk Media's Amended Complaint as true and draws all reasonable inferences in Lynk Media's favor. See Koch v. Christie's Intern. PLC, 699 F.3d 141, 145 (2d Cir. 2012).

Lynk Media is a company that licenses videos from its portfolio for use by online and print publications. (Am. Compl., ECF 16 ¶¶ 2, 11-12.) Lynk Media acquired the rights to three videos that were originally created and published by Oliya Fedun, an individual professionally known as "Oliya Scootercaster." (Id. ¶¶ 15-18, 21-24, 27-30.) The first of these videos ("Video 1") shows AOC being heckled by audience members at a town hall event. (Id. ¶ 15.) The second video ("Video 2") captures protestors interrupting a constituent forum with AOC. (Id. ¶ 21.) The third ("Video 3") is of a protest outside Gracie Mansion that resulted in a physical altercation between certain participants. (Id. ¶ 27.) Lynk Media registered Videos 1, 2, and 3 with the United States Copyright Office on June 22, 2023, November 9, 2022, and September 18, 2023, respectively. (Id. ¶¶ 19, 25, 31.)

Mediaite is a for-profit news and media organization that owns and operates the website www.mediaite.com. (Id. ¶¶ 3, 33-37.) On May 27, 2023, Mediaite published an article on its website about the heckling at AOC's town hall event that included Video 1 directly below the article's headline and prior to the body of the article. (Id. ¶ 38; Am. Compl. Ex. 2, ECF 16-2 at 1.) On October 20, 2022, Mediaite included Video 2 in the same part of an article reporting on the protests at AOC's constituent forum and her response during the event. (Am. Compl. ¶ 39; Ex. 2 at 2.) Mediaite included Video 3 at the same place within an article about the protest and physical altercation outside Gracie Mansion that it published on August 27, 2023. (Am. Compl. ¶ 40; Ex. 2 at 4.) Video 2 previously had been posted on Twitter by an account under the name

"Danny De Urbina," as had Video 3 by an account under the name "FreedomNews.Tv FNTV."[1] (See Ex. 2 at 2-5.)  Mediaite also featured these Twitter posts containing Videos 2 and 3 in the bodies of its articles.  (Id. at 3, 5.)  Moreover, Video 3 was published on the third-party website www.msn.com ("MSN") at the beginning of a story about the Gracie Mansion protest; the Twitter post containing Video 3 was also featured in that story.  (Am. Compl. ¶ 41; Ex. 2 at 6-7.)

       Lynk Media alleges that Mediaite "directly copied and/or displayed" what were "discernible segments of the critical portions" of its videos on the Mediaite website and MSN.  (Am. Compl. ¶ 45.)  Lynk Media claims that Mediaite did so without it having granted Mediaite a license or the right to use the videos.  (Id. ¶ 65.)  As to MSN, Lynk Media alleges that Mediaite provided Video 3 for use on that website.  (Id. ¶ 74.)  Lynk Media claims that Mediaite had a "continuing relationship with the owner and/or operator" of MSN and that Mediaite uses MSN to amplify its own content and increase its brand recognition by maintaining a recurring presence on the website and providing its content for display on there.  (Id. ¶ 76-77.)

       In this action, Lynk Media brings a claim for direct copyright infringement against Mediaite based on its use of the three videos.  (17 U.S.C. § 501; Am. Compl. at 7-8.)  Lynk Media also brings a claim for contributory copyright infringement against Mediaite arising out of the publishing of Video 3 on MSN.  (Am. Compl. at 8-9.)  Mediaite now moves to dismiss the Amended Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P.  With respect to Videos 2 and 3, Mediaite contends that its use of a technological process known as "embedding" to include those videos in its articles does not constitute copyright infringement.  As to these same two videos, Mediaite argues that because they were first posted to Twitter it thereby obtained a license to use them in its articles via Twitter's Terms of Service.  For all three videos, Mediaite

---

[1] For simplicity, the Court will refer to the online platform "X" by its former name of "Twitter."

contends that their inclusion in its articles was fair use. Mediaite further argues that Lynk Media has failed to state a claim for contributory infringement as to Video 3 because it has not shown that there was direct copyright infringement or that Mediaite had any knowledge of or material participation in the use of that video on MSN.

LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Court must examine only the well-pleaded factual allegations, disregarding any legal conclusions, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 678-79. When reviewing a motion to dismiss pursuant to Rule 12(b)(6), "a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993)).

DISCUSSION

I. Direct Copyright Infringement

"The owner of a copyright has the exclusive right to—or to license others to— reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work." Arista Records, LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (citing 17 U.S.C. § 106). To state a claim for copyright infringement, a plaintiff must allege "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S. 340, 361

(1991). "The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights" under section 106. Arista Records, 604 F.3d at 117 (quoting A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001)).

Lynk Media has pleaded ownership of valid copyrights to Videos 1, 2, and 3. (See Am. Compl. ¶¶ 18-19, 24-25, 30-31, 63-64.) It has also alleged that by using the three videos in its articles, Mediaite "improperly and illegally copied, reproduced, distributed, adapted, and/or publicly displayed" Lynk Media's copyrighted works in violation of "one of [its] exclusive rights" under section 106. (Id. ¶ 66.) Lynk Media's allegations largely center on Mediaite's violation of its exclusive right to display the three videos publicly. (See id. ¶¶ 5, 45, 67.) Mediaite does not dispute that it used the three videos in articles published on its website.

Lynk Media has sufficiently pleaded both copyright ownership and infringement. The Court's inquiry therefore turns to the defenses that Mediaite has raised in response to Lynk Media's claim of direct copyright infringement.

A. Mediaite's "Embedding" and Fair Use Defenses

At this stage, the Court cannot resolve Mediaite's defense reliant on the technological process of "embedding" or its defense of fair use.

The first of these is premised on the Ninth Circuit's adoption of the "server test" in Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146 (9th Cir. 2007). Applying that test in the context of the display right, the Ninth Circuit concluded that a website publisher "displays a photographic image by using a computer to fill a computer screen with a copy of the photographic image fixed in the computer's memory." Id. at 1160. But, according to the Ninth Circuit, there is no display for purposes of the Copyright Act when a website publisher's computer does not store a copy of the image and the publisher instead "provides HTML

instructions that direct a user's browser to a [third-party] computer that stores the full-size photographic image." Id. at 1160-61. "Providing these HTML instructions is not equivalent to showing a copy" because "the HTML instructions are lines of text, not a photographic image" and the HTML instructions merely facilitate the interaction between the user's browser and the third-party computer rather than "themselves caus[ing] infringing images to appear on the user's computer screen." Id. at 1161.

Mediaite argues that its "embedding" of Videos 2 and 3 in its articles does not constitute copyright infringement under the "server test," which it urges the Court to apply to this case. Mediaite points out that Videos 2 and 3 were posted publicly on Twitter and contends that its articles "simply provided in-line HTML links" to the Twitter posts containing these videos. According to Mediaite, the screenshots of its articles featuring the relevant Twitter posts that were included as Exhibit 2 to Lynk Media's Amended Complaint clearly show the use of "embedding." In further support of its defense, Mediaite has submitted examples of what it states are online publications utilizing "embedding" to include content in their articles and has cited to a definition of "Embedded Media" that references the use of HTML.

Notably, the courts in this Circuit that have considered the Ninth Circuit's "server test" with respect to the section 106 display right have rejected it as inconsistent with the text and legislative history of the Copyright Act. See Goldman v. Breitbart News Network, LLC, 302 F. Supp. 3d 585, 593 (S.D.N.Y. 2018); Nicklen v. Sinclair Broadcast Group, Inc., 551 F. Supp. 3d 188, 195 (S.D.N.Y. 2021); McGucken v. Newsweek LLC, 19-cv-9617 (KPF), 2022 WL 836786, at *6 (S.D.N.Y. Mar. 21, 2022). In any event, under the Rule 12(b)(6) standard of review, the Court lacks the necessary facts to determine whether Mediaite "embedded" Videos 2 and 3 in its articles through the use of HTML instructions. The Court recognizes that Mediaite featured

Twitter posts containing Videos 2 and 3 in its articles. (Ex. 2 at 3, 5.) However, Lynk Media's Amended Complaint makes no allegation as to the technological process that Mediaite used to accomplish this, nor has the Court's review of Lynk Media's screenshots of Mediaite's articles revealed that process. As a result, the materials that may be properly considered by the Court on a motion addressed to the sufficiency of the Amended Complaint do not permit the Court to conclusively determine that the examples of "embedding" that Mediaite has submitted or the definition of "Embedded Media" that it has put forth match the process that it actually used. Without more, the Court cannot simply assume as a matter of law that Mediaite "embedded" Videos 2 and 3. The Court therefore need not consider any possible application of the "server test" to the allegations of the Amended Complaint.

The resolution of Mediaite's fair use defense does not fare any better. The Copyright Act allows for some "fair" uses of copyrighted works, including for purposes such as criticism, news reporting, and scholarship. See 17 U.S.C. § 107. The statute also provides a non-exhaustive list of factors for courts to consider in their fair use determinations: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." Id. Because fair use is an affirmative defense, the party claiming fair use bears the burden of proof. See Authors Guild v. Google, Inc., 804 F.3d 202, 213 (2d Cir. 2015). To determine whether a particular use is "fair," courts "must engage in an open-ended and context-sensitive inquiry." Swatch Group Management Services Ltd. v. Bloomberg L.P., 756 F.3d 73, 81 (2d Cir. 2014) (quoting Blanch v. Koons, 467 F.3d 244, 251 (2d Cir. 2006)) (internal quotation marks omitted).

"The [Supreme] Court has cautioned that the four statutory fair use factors may not be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith, 598 U.S. 508, 550-51 (2023) (quoting Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578 (1994)) (internal quotation marks omitted).

Due to the fact-intensive nature of this inquiry, "it is rarely appropriate for a court to make a determination of fair use at the motion to dismiss stage." Grant v. Trump, 563 F. Supp. 3d 278, 284 (S.D.N.Y. 2021). Instead, fair use "is most commonly resolved on summary judgment or at trial." Goldman v. Breitbart News Network, LLC, 17-cv-3144 (KBF), 2017 WL 11711301, at *2 (S.D.N.Y. Aug. 21, 2017). That is because "whenever the Court needs to review all four factors, the allegations in the complaint are typically insufficient." Id. Nonetheless, the Second Circuit "has acknowledged the possibility of fair use being so clearly established by a complaint as to support dismissal of a copyright infringement claim." TCA Television Corp. v. McCollum, 839 F.3d 168, 178 (2d Cir. 2016). But, here, the Court has concluded that Mediaite's "entitlement to a fair use defense [is] not so clearly established on the face of the amended complaint and its incorporated exhibits as to support dismissal." Id.

For instance, the third fair use factor requires the Court to consider "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107. "Generally, a finding of fair use is more likely when small amounts, or less important [parts] of the work are copied than when the copying is extensive, or encompasses the most important parts of the original." Hachette Book Group, Inc. v. Internet Archive, 115 F.4th 163, 187 (2d Cir. 2024) (quoting Authors Guild, 804 F.3d at 221) (brackets and internal quotation marks omitted). Lynk Media's only allegation pertinent to this factor is that Mediaite used

"discernible segments of the critical portions" of Lynk Media's videos. (See Am. Compl. ¶ 45). This allegation alone does not enable the Court to determine precisely how much of the videos Mediaite used in its articles or the actual content that these segments contained. The screenshots of Mediaite's articles submitted as Exhibit 2 to the Amended Complaint show only still frame images of Videos 1, 2, and 3 at the beginning of each article and of Videos 2 and 3 within the featured Twitter posts. (Ex. 2 at 1-5.) Particularly with respect to the three standalone versions of the videos in the articles, the Court cannot deduce from still frame images the amount of the videos that Mediaite used or the full nature of their underlying content.[2] Therefore, without a more fully developed record the Court is unable to conduct the necessary inquiry to determine whether Mediaite has met its burden to show that it is entitled to a fair use defense.

For these reasons, Mediaite's motion to dismiss on the ground of its use of the technological process of "embedding" and on the ground of fair use is denied.

B. Mediaite's License Defense

Mediaite next argues that because Videos 2 and 3 were first posted to Twitter by the accounts "Danny De Urbina" and "FreedomNews.Tv FNTV," respectively, it in turn obtained a license to use those videos in its articles pursuant to Twitter's Terms of Service. The existence of an applicable license is "an affirmative defense to a claim of copyright infringement, and is a defense that the alleged infringer must plead and prove." Yamashita v. Scholastic Inc., 936 F.3d 98, 104 (2d Cir. 2019) (per curiam). While Mediaite relies on Twitter's current Terms of Service in support of its defense, the Court focuses on the Terms of Service that were in effect

---

[2] The online articles themselves are of no further aid to the Court on these issues because the standalone versions of the three videos appear to have been removed. See https://www.mediaite.com/tv/youre-a-piece-of-sh-aoc-town-hall-in-queens-erupts-in-chaos-shouting-matches-security-scuffles-over-immigration-and-more/; https://www.mediaite.com/news/watch-alexandria-ocasio-cortez-mockingly-dances-to-protesters-chants-of-aoc-has-got-to-go/; https://www.mediaite.com/news/move-back-massive-brawl-breaks-out-at-curtis-sliwas-anti-immigration-rally-in-new-york-city/.

when the alleged infringing conduct took place.[3] See McGucken, 2022 WL 836786, at *2 n.3, *7 (analyzing the versions of Instagram's agreements and policies that were in effect during the relevant time period). The Court takes judicial notice of these previous Terms of Service for the limited purpose of resolving Mediaite's motion to dismiss given they remain "publicly accessible; there is no dispute as to the authenticity of the items; and while the meaning of the terms in the items may be in dispute, the existence of the terms themselves is not." McGucken v. Newsweek LLC, 464 F. Supp. 3d 594, 600 n.2 (S.D.N.Y. 2020) (citing Rule 201(b)(2), Fed. R. Evid.; Force v. Facebook, Inc., 934 F.3d 53, 59 n.5 (2d Cir. 2019)). Based on the Court's review of Twitter's Terms of Service, it concludes that Mediaite has not met its burden to show that it acted pursuant to a license from Twitter.

Under a heading titled "Your Rights and Grant of Rights in the Content," Twitter's Terms of Service applicable to Video 2 state the following in relevant part:

> By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods now known or later developed (for clarity, these rights include, for example, curating, transforming, and translating). This license authorizes us to make your Content available to the rest of the world and to let others do the same. You agree that this license includes the right for Twitter to provide, promote, and improve the Services and to make Content submitted to or through the Services available to other companies, organizations or individuals for the syndication, broadcast, distribution, Retweet, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use . . . .
>
> Twitter has an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as

---

[3] For Video 2, which was included in Mediaite's article dated October 20, 2022, that was Version 17 of the Terms of Service in effect from June 10, 2022, to May 18, 2023. See https://x.com/en/tos/previous. For Video 3, which was included in Mediaite's article dated August 27, 2023, that was Version 18 in effect from May 18, 2023, to September 29, 2023. See id.

> it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

(Twitter Terms of Service Version 17 ("Version 17"), Content on the Services § 3.) The Terms of Service applicable to Video 3 include substantively identical language under the same heading. (See Twitter Terms of Service Version 18 ("Version 18"), Content on the Services § 3.)

By their express language, the above Terms of Service grant a license to use content posted on the platform to Twitter and also give Twitter the right to sublicense that content to others. (See Version 17, § 3 ("[Y]ou grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) . . . This license authorizes us to make your Content available to the rest of the world and to let others do the same.") (emphasis added).) One plausible interpretation of the language is that a third party such as Mediaite would have needed to obtain a sublicense from Twitter in order to use Videos 2 and 3 in its articles. However, Twitter's Terms of Service do not clearly confer a sublicense on all "companies, organizations or individuals for the . . . publication of such Content on other media and services." (Id.) The language that follows in the Terms of Service may be read to limit the reach of Twitter's sublicensing right to its "ecosystem partners," which Mediaite does not claim to be. (Id.)

The Terms of Service applicable to Video 2 also contain the following passage under the same heading:

> You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant Twitter the license described above.

(Id.) Once again, the Terms of Service applicable to Video 3 include substantively identical language. (See Version 18, § 3.) Mediaite's claim to a license is premised on Videos 2 and 3 being first posted to Twitter by the users "Danny De Urbina" and "FreedomNews.Tv FNTV," respectively. But it is not clear from the face of Lynk Media's Amended Complaint or the attached exhibits what rights those users had in the two videos or what authority they had to publish them on Twitter. From this passage, it is not clear that any user that posts content on Twitter can grant a license or right to sublicense to Twitter in the first place. To the contrary, it is well-established that a "[copyright] owner may give a license to someone to exploit the work in some way, provided he owns that particular copyright interest." Davis v. Blige, 505 F.3d 90, 99 (2d Cir. 2007) (citing 17 U.S.C. § 106).

Due to these potential ambiguities, and the limited review allowed at this stage, the Court cannot conclude based on Twitter's Terms of Service that Mediaite had a sublicense to use Videos 2 and 3. Mediaite's motion to dismiss on the ground of this defense is denied.

II. Contributory Infringement

Mediaite has also moved to dismiss Lynk Media's claim of contributory infringement as to Video 3, which was published on MSN. To plead a claim of contributory infringement, "a plaintiff must first adequately allege direct infringement by a party other than the defendant." Hartmann v. Amazon.com, Inc., 20-cv-4928 (PAE), 2021 WL 3683510, at *6 (S.D.N.Y. Aug. 19, 2021). Beyond that, a plaintiff must allege facts that a defendant "with knowledge of the infringing activity, induce[d], cause[d], or materially contribute[d] to the infringing conduct of another." Brought to Life Music, Inc. v. MCA Records, Inc., 20-cv-1164 (RWS), 2003 WL 296561, at *2 (S.D.N.Y. Feb. 11, 2003) (quoting Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159, 1162 (2d Cir. 1971)). Mediaite argues

that Lynk Media has not made out a claim of direct copyright infringement and that it has also failed to allege that Mediaite had any knowledge of or material participation in the publishing of Video 3 on MSN. The Court disagrees.

As to the threshold issue of direct infringement by a third-party, Lynk Media has adequately alleged that the "owner and/or operator" of MSN infringed Lynk Media's copyright to Video 3 by using it on that website. (Am. Compl. ¶ 76.) The Court previously concluded that Lynk Media has sufficiently pleaded ownership of a valid copyright to Video 3. The Court also previously determined that Lynk Media has sufficiently pleaded infringement with respect to Mediaite's use of Video 3 on its own website, violating Lynk Media's exclusive right to display the video publicly. While the allegations in the Amended Complaint of "infringing activity" on MSN are somewhat vague, (id.), the use of Video 3 on that website appears to be indistinguishable from Mediaite's use of the video in its article. (See Ex. 2 at 4-7.) This provides a reasonable basis for the Court to infer that such use on MSN constitutes a distinct infringement of Lynk Media's display right.

Lynk Media has also alleged sufficient facts to satisfy the participation requirement of its contributory infringement claim. The necessary participation by a defendant will not be shown by alleging that it "merely provid[ed] the means to accomplish an infringing activity." Brought to Life Music, 2003 WL 296561, at *2 (citation omitted). "Rather, participation in the infringement must be substantial and the authorization or assistance must bear a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer." Id. (internal quotation marks and citation omitted). Here, Lynk Media alleges that Mediaite "disseminates the content on its Website via third-party web platforms which also display [Mediaite's] Website content." (Am. Compl. ¶ 4.) With respect to

MSN in particular, Lynk Media specifies that Mediaite "provid[ed] Video 3 for use" on that website. (Id. ¶ 74.) It then alleges a "continuing relationship" between Mediaite and MSN's "owner and/or operator" whereby the former "maintains a recurring presence on [MSN] and continues to provide its Website content for display on [there]." (Id. ¶ 76.) According to Lynk Media, Mediaite uses MSN "to amplify its Website content and increase brand recognition." (Id. ¶ 77.) Drawing all reasonable inferences in Lynk Media's favor, it has plausibly alleged that Mediaite was the source of the video at the center of the alleged infringement on MSN and that Mediaite provided the video pursuant to an ongoing relationship with the alleged direct infringer.

Lynk Media's allegations are also sufficient for the Court to infer the requisite knowledge. "The knowledge standard is an objective one; contributory infringement liability is imposed on persons who know or have reason to know of the direct infringement." Lane Coder Photography, LLC v. Hearst Corporation, 22-cv-5071 (LTS), 2023 WL 5836216, at *4 (S.D.N.Y. Sept. 8, 2023) (quoting Arista Records, 604 F.3d at 118). With regard to constructive knowledge of the infringing activity, other courts have noted that "[w]illful blindness is not an excuse, and is sufficient to satisfy the knowledge requirement." Michael Grecco Productions, Inc. v. Valuewalk, LLC, 345 F. Supp. 3d 482, 513 (S.D.N.Y. 2018). Standing alone, Lynk Media's allegation that Mediaite had "actual and/or constructive knowledge" of the infringing activity on MSN is conclusory. (Am. Compl. ¶ 78.) But Lynk Media has also alleged three facts that together allow for an inference in its favor: (1) Lynk Media did not grant Mediaite a license or right to use Video 3, (2) Mediaite provided Video 3 for use on MSN, and (3) Mediaite uses MSN to amplify its content. (Id. ¶¶ 65, 74, 77.) Based on these facts, the Court can infer that Mediaite had constructive knowledge of the alleged direct infringement on MSN. That inference

is strengthened where, as here, "a defendant directly provides another with the means to commit infringement." Lane Coder Photography, 2023 WL 5836216, at *4.

Accordingly, Mediaite's motion to dismiss Lynk Media's claim of contributory infringement as to Video 3 is denied.

CONCLUSION

For the reasons explained above, Mediaite's motion to dismiss the Amended Complaint is DENIED in its entirety. The Clerk of Court is respectfully directed to terminate the motion pending at ECF 17.

SO ORDERED.

*P. Kevin Castel*<br>
P. Kevin Castel<br>
United States District Judge

Dated: New York, New York<br>
       January 14, 2025